## FIDELITY & DEPOSIT CO. OF MARYLAND v. CLAIBORNE PARISH SCHOOL BOARD et al.

(District Court, W. D. Louisiana, Shreveport Division. January 25, 1926.)

No. 1528.

**1. Schools and school districts ⬅81(2), 84.**

Contract to build schoolhouse and surety contract must be construed together with Act La. No. 224 of 1918 under which they were given.

**2. Principal and surety ⬅167—Provision in contract for retention of percentage of price until completion was for benefit of surety as well as owner, and surety might require compliance.**

Provision in contract for retention by school board of percentage of contract price until completion, while primarily for its protection, was also for benefit of creditors of contractor and of surety, who was bound to them, and surety had right to exact performance of contract in such respect.

**3. Pleading ⬅111.**

On plea to jurisdiction of court, allegations of petition are to be treated as true.

**4. Principal and surety ⬅182—Surety, after paying claims, has contractual right of action against principal, distinguished from any right of subrogation or by assignment (Civ. Code La. arts. 2161, 3052, 3053).**

Under Civ. Code La. arts. 2161, 3052, 3053, surety having paid claims has right of action against principal in his own right, as result of his contractual relations, as distinguished from any right by subrogation or assignment from creditors.

**5. Subrogation ⬅8—Surety for contractor building schoolhouse has equitable lien and right of subrogation on funds in hands of school board for claims of materialmen paid by surety.**

Surety for school building contractor, paying claims of materialmen, has equitable lien and right of subrogation on funds due contractor from school board, even in absence of express statutory subrogation.

**6. Principal and surety ⬅185—Surety's right against principal for claims paid materialmen and laborers arises in assumpsit as for money paid.**

Right of surety to recover of principal building contractor money paid to discharge claims of materialmen and laborers arises in assumpsit as for money paid, and is unchanged by any assignment of claims.

**7. Courts ⬅312(1)—Action by nonresident surety against school building contractor held based on contractual obligation, not on assignments of resident claimants, and within federal court jurisdiction on ground of diversity of citizenship (Jud. Code, § 24 [Comp. St. § 991]).**

Under Jud. Code, § 24 (Comp. St. § 991) action by nonresident surety against school building contractor *held* based on contractual obligation, not on assignments of resident claimants, and within federal court jurisdiction be-cause of diversity of citizenship.

**8. Subrogation ⬅8—Surety of school building contractor, on payment to materialmen and laborers, has right of action against school board for wrongful conversion of funds, due contractor, but paid another creditor.**

Surety on school building contractor's bond, obliged to pay laborers and materialmen, *held* to have right of action against school board for wrongful conversion of money, which it with-held from contractor, but paid to bank having claim against him not arising out of contract.

At Law. Action by the Fidelity & Deposit Company of Maryland against the Claiborne Parish School Board and others, wherein defendants excepted to the jurisdiction. Exception overruled.

Cook & Cook, of Shreveport, La., and P. M. Milner, of New Orleans, La., for plaintiff.

McClendon & Seals, of Homer, La., and Thigpen, Herold, Lee & Cousin, of Shreveport, La., for defendants.

DAWKINS, District Judge. Plaintiff, a Maryland corporation, alleges that on March 26, 1923, it became the surety of one Ben F. Casey, for the faithful performance of a contract with the school board of Claiborne parish, La., for the erection of a school building for the stipulated price of $130,000, that the said contractor failed to pay certain furnishers of materials for the completion of the work, and that plaintiff, as surety, was sued and compelled to pay judgments in the aggregate of $10,202.54, and that it is additionally liable upon other amounts which have not been paid. In this proceeding it seeks reimbursement from the said contractor, the school board, the officers and members thereof, and the Planters' Bank of Haynesville, La., upon the ground that the balance due by the school board to the contractor of $12,357.59, for the completion of said work had been wrongfully, collusively, and fraudulently diverted by the said defendants to the payment of a personal debt of Casey to the said bank, without it having any lien upon or right to said funds; that said building had been accepted by the school board, although it had not recorded its acceptance, as required by the statute; that the claimants paid by petitioner had served and recorded their said claims according to law; that the balance due the contractor "was a sacred fund, pledged by the laws of this state to the payment of laborers, subcontractors, and material furnishers, to whom your petitioner was directly liable as surety for Ben F. Casey"; that the said bank had loaned to Casey its money upon unsecured notes, and, to de-

feat petitioner's rights, he had directed the school board to "pay to the Planters' Bank of Haynesville, La., balance of funds on contract price and extra work due me on the Haynesville grammar and high school buildings, in the town of Haynesville, La."; and that the said sum of $12,642.59 was on April 3, 1924, paid to said bank pursuant to the said illegal and fraudulent scheme of said defendants to prefer it to the prejudice of plaintiff. Petitioner further alleges as follows:

"Petitioner shows and charges that the Claiborne parish school board and John S. Patton, superintendent, knew of the existence of claims of the subcontractors and material furnishers against the balance due the contractor, Ben F. Casey, on the contract for the building of the high school and their recorded liens against the building to an amount in excess of the balance in its hands, and that the money was legally due and payable for its own protection and the protection of your petitioner as surety for Ben F. Casey, and yet the said Claiborne parish school board and John S. Patton, superintendent, and John E. Gray, president, did unlawfully, illegally, in bad faith, pay over to the Planters' Bank of Haynesville on April 3, 1924, by check No. 248, $12,642.59, balance due Ben F. Casey, with the result that the said claimants, not being paid, brought suit against Ben F. Casey and your petitioner, and obtained judgments against your petitioner, which it has paid in the proceedings as follows: [Here follows a list of the claims and judgments which plaintiff alleges it had paid.]"

Plaintiff further alleges that, when it paid said claim, as it was legally bound to do, it received from said claimants conventional assignments and full subrogations to all their rights under said contract flowing from the timely recording and service of attested accounts upon said school board, and that it had made demand upon the said defendants for the restoration of said funds and its reimbursement for the outlay so made, but without avail.

The prayer was for service upon all defendants and for judgment "setting aside and annulling the payment by the said Claiborne parish school board to the Planters' Bank of Haynesville, La., of the $12,642.59, made by it on April 3, 1924, under the alleged and illegal assignment of December 31, 1923, * * * of the balance due * * * upon the high school building, * * * " and that petitioner have judgment in solido against said parties in the sum paid by it "as

subrogee and assignee" of the several claims, with interest and costs. In the alternative, it prayed for judgment against all of said defendants, including the school board, in the sum of $12,642.59.

Alleged copies of the contract between the school board and Casey, the bond upon which plaintiff was surety, certificate of mortgages showing recordation of attested accounts, assignments, and subrogations by the several claimants, were attached to and made part of the petition.

Defendants excepted upon the ground that, plaintiff having sued upon assignments of claims of persons who were not alleged to have been citizens of states other than Louisiana at the time of the transfer, this court was without jurisdiction under the first paragraph of section 24 of the Judicial Code (Comp. St. § 991). The matter now to be decided is the sufficiency of the plea.

### Opinion.

The contract for the erection of the building in this case was executed, and the bond for its performance given, under Act No. 224 of 1918, affecting buildings by the state, its subdivisions and public boards. It requires that contracts for more than $500 shall be reduced to writing, and the contractor shall furnish bond for not less than 50 per cent. of the price to guarantee faithful performance, and that "an additional obligation for the payment by the contractor and by all subcontractors for all work done, labor performed, or materials furnished, * * * " shall exist "and no modifications, omissions, additions in or to the terms of the said contract, in the plans or specifications or in the manner and mode of payment shall in any manner affect the obligation of the surety." The contract and bond are required to be recorded in the mortgage office on the day the work begins and not later than 30 days thereafter. Section 2 of the act reads as follows:

"Be it further enacted, etc., that any person, firm or corporation, association of persons or partnership to whom any money shall be due on account of having done any work, performed any labor on, or furnished any material in the construction, erection, alteration or repair of any such building, road work or improvement, may file with the said authority having the said work done, and record in the office of the recorder of mortgages for the parish in which the said work is being done, any time after the maturity of his claim, a sworn statement of the amount due him, and any payments made thereafter by said authority without deducting the amount

of the claims so served on it, shall be at its own risk."

Said act further provides, in section 3, that any one having a claim on account of work done or material furnished, shall file a sworn statement thereof within 45 days after the acceptance of the work by the official body, or the defaulting of the contractor, and record it in the mortgage office, but that the said delay shall not begin to run until "the said authorities shall record in the mortgage office of the parish in which the work was done an acceptance of the work, or notice of the default; * * * provided further that nothing in this act shall be so construed as to deprive any person or claimant within the terms of this act of his right of action on the board [bond?], which right shall accrue at any time after the maturity of his claim."

Section 4 provides that, if, at the expiration of the 45 days, there are recorded claims, the authorities *shall* file a proceeding citing all claimants, the contractor, surety, etc., into court, and "said authorities shall assert whatever claims they have against any and all of them in said petition, and require the said claimants to assert whatever claims they have against any and all of them, and all of said claims shall be tried in concursus." Section 5 subordinates the claim of the official body to those of laborers and materialmen, and gives any claimant the right to provoke the proceeding if the authorities do not. Section 6 declares that, if no objections are made "by any claimant to the solvency or sufficiency of the bond, the said authorities shall, ten days after the service of judicial notice on each claimant having recorded claims * * * of the concursus proceeding, obtain from the clerk a certificate to that effect, and the said certificate shall relieve the said authorities of any *personal liability,* and the recorder of mortgages shall cancel all claims recorded as aforesaid"; and, if objection is made to the bond, and it is found insufficient or the surety not solvent, or if bond was not exacted or timely recorded, *"the said authorities shall be in default and shall be liable to the same extent as the surety would have been.* The surety on the bond shall be limited to such defenses as the principal on the bond." (All italics by the author of this opinion.)

In this case the allegation, in effect, is that the contract was entered into, the bond given, and the whole recorded as required by law, under the terms of which the contractor agreed to furnish the labor and materials and to erect the building for a lump price. It was stipulated that the bond should be given, and, with respect to the payment of the price, it was provided:

"Article 3. The owner agrees to pay the contractor in current funds for the performance of the contract one hundred thirty thousand and no/100 ($130,000.00) dollars, subject to additions and deductions as provided in the general conditions of the contract and to make payments on account thereof as provided therein as follows: On or about the 1st day of each month eighty-five (85) per cent. of the value, proportionate to the amount of the contract, labor and materials incorporated in the work and acceptable materials on premises up to the 1st day of that month as estimated by the architect, less the aggregate of previous payments. On substantial completion of the entire work, a sum sufficient to increase the total payments to ninety-five per cent. of the contract price, and forty-five days thereafter provided the work be fully completed and the contract fully performed, the balance due under the contract."

The bond was given for the sum of $130,-000, and the condition is that the contractor shall faithfully perform the obligations of his contract, "which contract is hereto annexed and made a part hereof as fully as if written at length herein, and shall pay all subcontractors, workmen, laborers, mechanics, and furnishers of material, employed by said principal under said contract in conformity with Act No. 221 * * * of 1914, * * * and all laws amendatory. thereof. * * *"

[1, 2] The nature of building contracts, and the variety of persons and interests ordinarily involved therein, are such that from time immemorial it has been necessary to enact special laws dealing therewith and defining the rights and obligations of those concerned. If only the owner and the builder were to be affected, there could be no more reason for special provision covering this relation than in any other ordinary case of contract, but there are the owners of property, the contractors, subcontractors, laborers, materialmen, and at times mortgage creditors, and others to be considered and protected; hence, under the stimulus of these varied interests, the Legislature is constantly amending, changing, and modifying such statutes to meet the requirements of the building public. It would seem that the first idea in all instances is to protect those who furnish material and perform labor on such undertakings, in order to encourage building and improvement; and, secondly, to relieve the owner and his property from any greater burden than the sum promised under the contract.

In other words, if the contractor underbids what it will actually cost to erect a building, the fault is his own, and he must bear the loss. On the other hand, by complying with the statute, the owner may escape the contingency of personal liability or the involvment of his property beyond the amount stipulated by exacting bond with surety, both for the performance of the work according to contract and for the payment of claims against the property.

The statute in this case, which deals alone with public bodies, makes the surety liable for the performance of both these obligations, and gives rise to two separate causes of action by two distinct classes of persons for their enforcement. Each may pursue his respective rights, independently of the other, except, when laborers and materialmen properly file and record their claims, the owner is *required* to provoke, and any claimant *may* provoke, a proceeding in concursus in which the rights of all parties are concurrently determined. It is true that in a sense the bond is a separate undertaking, but, under the statute and stipulations of the two contracts, in effect making each a part and parcel of the other, I think they should be construed together. In this situation there exist mutual benefits and obligations to be enforced according to the fair intendment of the law and the understanding of the parties. The contractor is bound to erect and deliver the building according to specifications, free from all claims or incumbrances, and the owner is bound to pay the price as stipulated. The surety guarantees the performance of the former, and has the right to exact payment by the latter. The provision for the retention of a percentage of the price until final completion of the work, while primarily for the protection of the owner, is also for the benefit of claimants and of the surety who is bound to them. It has the right to exact that the contract in this respect be carried out. Of course it cannot be relieved, as between itself and the laborers or materialmen, by the failure of the owner to pay the price; yet the latter must account to the contractor, and, when the surety does that which the owner bound itself to do—i. e., furnishes the money to pay the claimants —it would seem that it could require the payment, for its reimbursement, of funds due under the contract, as for money paid in discharge of the owner's obligation.

[3] In addition, as above pointed out, the law itself required the owner, upon the filing and recording of attested accounts by claimants, to provoke a concursus proceeding to the end that the funds remaining due might be paid to those entitled to receive them. According to the allegations of the petition, it did not do this, but, in violation of its equitable and moral duty to see that those whose labor and materials had contributed to the construction of the building were satisfied, chose to pay those funds to an outsider on the order of the contractor. The effect of this was to divert the money provided for the performance of the contract to a purpose other than that for which it was intended and for which the owner agreed to pay it, without the consent of the surety, and in violation of a stipulation of the contract upon the faith of which the latter bound itself. If it could do this as to a part of the price, I can see no reason why it might not have done so as to the whole, and thereby have compelled the surety to pay the entire cost of the building, without affording it the protection provided by the contract. There can be little doubt that one of the inducements for becoming surety was the condition under which payments were to be made, and which gave reasonable assurance that the money agreed to be furnished by the owner would be devoted to paying for the building. On the other hand, if the allegations of the petition are to be treated as true, which must be done for the purpose of the plea in this case, the owner not only failed to live up to this requirement, but collusively and fraudulently conspired with the contractor and others to violate its obligation in that respect.

The Louisiana Code, articles 3052 and 3053, with respect to the rights of sureties, provides as follows:

"3052. * * * The surety who has paid the debt, has his remedy against the principal debtor, whether the surety has been given with or without the knowledge of the debtor.

"This remedy takes place both for the principal and interest, and for the costs which the surety may have been sentenced to pay; but with regard to the costs, the remedy of the surety begins only from the day he has given notice to the principal debtor, that a suit was commenced against him."

"3053. * * * With regard to that remedy, the surety has the same right of action and the same privilege of subrogation, which the law grants to codebtors in solido."

[4] The provision of the law referred to in article 3053, as to the surety's right of action, is found in the third paragraph of article 2161 of the Code, dealing with legal subrogation, which reads:

"3. *Codebtor.* For the benefit of him who, being bound with others, * * * for the payment of the debt, had an interest in discharging it."

Of course, in cases of suretyship on bonds of this character, the principal debtor is the contractor, and the right of action and legal subrogation mentioned by the Code is as against him, but the provision quoted serves to demonstrate that the surety is given such action in his own right and as a result of his contractual relation, as distinguished from any right conventionally transferred from the creditor whom he has paid. It is true he is legally subrogated to all of the liens, privileges, and other incidents of the claims of the creditors, but this is a legal consequence which cannot affect the individual cause of action which the law itself grants. Neither do I think that conventional assignments and subrogation can destroy or affect the status thus enjoyed. They give no greater rights than the law itself affords.

[5] Even in the absence of express statutory subrogation, in circumstances like the present, the surety has an equitable lien and right of subrogation upon the balance of the funds in the hands of the owner, which entitles it to be paid in preference to persons in no wise connected with the original contract, and this right relates back to the formation of the contract and execution of the bond.

In dealing with a somewhat similar situation, in the case of Prairie Bank v. U. S. (U. S. v. Hitchcock), 17 S. Ct. 144, 164 U. S. 232, 41 L. Ed. 412, the Supreme Court had for determination the relative rights of a surety upon the bond of a contractor for the erection of a government building, and a bank which had loaned money to the contractor, and, in discussing the matter, that court, through Justice White, said:

"Under the principles thus governing subrogation, *it is clear whilst Hitchcock was entitled to subrogation, the bank was not.* The former in making his payments discharged an obligation due by Sundberg for the performance of which he (Hitchcock) was bound under the obligation of his suretyship. The bank, on the contrary, was a mere volunteer, who lent money to Sundberg on the faith of a presumed agreement and of supposed rights acquired thereunder. The sole question, therefore, is whether the equitable lien, which the bank claims it has, without reference to the question of its subrogation, is paramount to the right of subrogation which unquestionably exists in favor of Hitchcock. In other words, the rights of the parties depend upon whether Hitchcock's subrogation must be considered as arising from and relating back to the date of the original contract, or as taking its origin solely from the date of the advance by him.

"A great deal of confusion has arisen in the case by treating Hitchcock as subrogated merely 'in the rights of Sundberg & Co.' in the fund, which, in effect, was saying that he was subrogated to no rights whatever. Hitchcock's right of subrogation, when it became capable of enforcement, was a right to resort to the securities and remedies which the creditor (the United States) was capable of asserting against its debtor Sundberg & Co., had the security not satisfied the obligation of the contractors, and one of such remedies was the right based upon the original contract to appropriate the 10 per cent. retained in its hands. If the United States had been compelled to complete the work, its right to forfeit the 10 per cent. and apply the accumulations in reduction of the damage sustained remained. The right of Hitchcock to subrogation, therefore, would clearly entitle him when, as surety, he fulfilled the obligation of Sundberg & Co. to the government, to be substituted to the rights which the United States might have asserted against the fund. It would hardly be claimed that, if the sureties had failed to avail themselves of the privilege of completing the work, they would not be entitled to a credit of the 10 per cent. reserved in reduction of the excess of cost to the government in completing the work beyond the sum actually paid to the contractor, irrespective of the source from which the contractor had obtained the material and labor which went into the building.

"That a stipulation in a building contract for the retention, until the completion of the work, of a certain portion of the consideration, is as much for the indemnity of him who may be guarantor of the performance of the work as for him for whom the work is to be performed, that it raises an equity in the surety in the fund to be created, and that a disregard of such stipulation by the voluntary act of the creditor operates to release the sureties, is amply sustained by authority. Thus in Calvert v. London Dock Co., 2 Keen, 638 (1838), where a contractor had undertaken to perform certain work, and it was agreed that three-fourths of the work, as finished, should be paid for every two months, and the remaining one-fourth upon completion of the whole work, it was held that the sureties for the due performance of the contract were released from their liability by reason of payments exceeding three-fourths of the work done having been made to the

contractor without the consent of the sureties before the completion of the whole work." (Italics by the writer of this opinion.)

And again, in the case of Henningsen v. Fidelity & Guaranty Co., 28 S. Ct. 389, 391, 208 U. S. 404 at page 410 (52 L. Ed. 547), the Supreme Court, having under consideration another controversy between a surety and a bank over the balance due upon a contract for the performance of government work, said:

"Henningsen, for we may leave Clive out of consideration, entered into a contract with the United States to construct buildings. The Guaranty Company was surety on that contract. Its stipulation was not merely that the contractor should construct the buildings, but that he should pay promptly and in full all persons supplying labor and material in the prosecution of the work contracted for. He did not make this payment, and the Guaranty Company, as surety, was compelled to and did make the payment. Is its equity superior to that of one who simply loaned money to the contractor to be by him used as he saw fit, either in the performance of his building contract or in any other way? We think it is. It paid the laborers and materialmen and thus released the contractor from his obligations to them, and to the same extent released the government from all equitable obligations to see that the laborers and supplymen were paid. It did this not as a volunteer but by reason of contract obligations entered into before the commencement of the work."

[6] As between the surety and its principal, the right of the former to recover of the latter money paid to discharge claims of materialmen and laborers arises in assumpsit, as for money paid, and the fact that the said claimants may have conventionally assigned their claims to the surety does not change the character of the right.

"The action by the surety against his principal for indemnity is brought on the contract implied by law, and this is true notwithstanding the fact that a formal assignment of the claim has been made by the creditor either to the surety or to a third person. The form of the action is assumpsit for money paid, or a special action on the case, the claim for reimbursement being a purely legal one, enforceable only by action, in the absence of special circumstances. An express contract of indemnity between the surety and the principal does not preclude a suit on the implied contract." Cyc. vol. 32, pp. 261–262, verbo "Principal and Surety," and authorities cited in footnote.

"Where there are privies in a contract with the knowledge of a debtor to secure to his creditor the payment of a debt, the payment of it by any one of them other than the debtor is a payment at his request, and is an express assumpsit to reimburse the amount. Where the surety of a surety pays the debt of a principal, under a legal obligation, from which the principal was bound to relieve him, such a payment is a sufficient consideration to raise an implied assumpsit to repay the amount, although the payment was made without a request from the principal." Hall v. Smith, 5 How. 96, 12 L. Ed. 66.

[7] So I think it is clear that the action in this case, as between the plaintiff and Casey, is one which might have been brought here because of the diversity of citizenship of the parties, and that this is determinative of the question before the court.

If the petitioner has stated a cause of action against the school board, it is by virtue of rights growing out of the relation created by the contract and bond, together with the legal and equitable subrogation which the law affords, notwithstanding the conventional assignments. Besides the legal and equitable principles heretofore discussed, all of the defendants in this case are charged with fraud and collusion, which as to some of them amounts to an allegation of breach of contract, and as to others the commission of a tort in inducing the violation of these contractual rights, as well as the taking and receiving of a fund upon which the plaintiff had a superior lien and claim. As to the duty of the creditor who has received security (and in this case the school board was undoubtedly the creditor of Casey for the performance of the obligations of his contract, and the retention of a percentage of the price was in the nature of additional security for that purpose), it is stated by Cyc., abundantly supported by authority, that:

"The creditor, having received property of the principal, must account for it; it being his duty to appropriate such property and any profits therefrom to the debt for which the security was given. If the creditor fraudulently incumbers or conceals the property of an insolvent principal, or, having received security for the debt for which the surety is bound, applies it to a purpose other than the satisfaction of that debt, the surety is discharged to the extent of the value of the security misapplied." Cyc. vol. 32, p. 321.

[8] In this case, however, the surety's obligation to laborers and materialmen was such

that it could not be discharged by the conduct of the owner, and it had therefore to pay their claims; hence I think it must follow, almost as a corollary, that, if it could not be discharged from those obligations, then it had a right of action against the owner for the wrongful conversion of the security.

My conclusion is that the plea to the jurisdiction is without merit, and the same is accordingly overruled.